# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

_____ )
                               )
EMPLOYEE A, Federal Employee, and   )
EMPLOYEE B, Federal Employee,      )       Case No. 8:21-cv-02696
                               )
                               )       Judge Deborah Chasanow
        Plaintiffs,             )
                               )
                               )
           v.                    )
                               )
                               )
JOSEPH R. BIDEN in his official capacity   )
as President of the United States;       )
XAVIER BECERRA in his official capacity  )
as Secretary of Health and Human Services;  )
LLOYD J. AUSTIN III in his official     )
capacity as Secretary of Defense,      )
                               )
                               )
        Defendants.          )
                               )
_____ )

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### ARGUMENT

## I     INTRODUCTION

This is an extraordinary and drastic Executive Order that requires an extraordinary and drastic remedy. Consider the numbers of those similarly situated as Plaintiffs. As of **November 10, 2021**, the U.S. Department of Defense reports (note that these figures come *after* the November 8th deadline for electronically submitting attestation forms certifying full vaccination):

1

DoD Vaccination Administration to DoD Population - DoD Civilian (last updated 11/10/21): 50,279 Partially Vaccinated; **335,986 Fully Vaccinated**; Total DoD Civilian at least Partially Vaccinated equals 386,265. https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/, accessed on 16 November 2021).  And,

Office of Personnel Management (OPM) - Policy, Data, Oversight Data, Analysis & Documentation - Federal Civilian Employment: **Total, All Areas Department of Defense is 676,840 as of September 2017**. https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/, accessed on 16 November 2021.

Estimated DoD Civilians at least Partially Vaccinated = **57%**

Only a fraction of these federal employees will qualify for the religious or medical exemption to Executive Order 14043.  There is no doubt this case is wholly without precedent- never before has the employer/ employee relationship included such a condition of unwanted physical invasion in the history of our country.  Never before, and this includes the case of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), has there been a penalty so high as to amount to coercion.  By contrast, in *Jacobson*, the penalty for noncompliance with a local health ordinance (pursuant to state health and police power) was $5.  Using the Consumer Price Index published by the U.S. Department of Labor, a quick check of the inflation calculator comes to $157.15 in current value.  *See* https://www.officialdata.org/us/inflation/1905?amount=5.  The many federal employees who are indeed on the fast track to dismissal following **November 22nd** (as the Task Force has made abundantly clear), would gladly pay such a sum.  *Jacobson* furthermore underscores Plaintiffs' case, not that of the Government.  What the Government contends is a semblance of modern judicial rational basis review must be put into the context of its time, which predates the evolution of judicial strict scrutiny review, particularly in the area of physical invasiveness discussed here.

The expansion of liberty and privacy rights did not occur until the latter half of the twentieth century. *See Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 270 (1990) (articulating that, until recently, "the number of right-to-refuse-treatment decisions was relatively few"). The evolution of protections against physical invasiveness and unwanted medical treatment is grounded in common law principles of battery and informed consent. *Id*. at 269 ("[N]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.") (quoting *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

And, to reiterate from Plaintiffs' Motion, the privacy interests involved in penetrating the skin and into the veins are so particularly invasive that the Supreme Court recently held in the Search Incident to Arrest Doctrine that there is to be a clear distinction between breath tests in drunk driving stops and a blood draw for the same evidence, which henceforth requires a warrant from a judicial officer. *Birchfield v. North Dakota*, 579 U.S. ____ (2016). In *Missouri v. McNeely, supra*, Justice Sotomayor, writing for the majority, found it persuasive that a clear majority of the States placed significant restrictions on when police may obtain a blood sample despite a suspect's refusal, often limiting testing to cases involving accidents resulting in death or serious injury, or prohibit nonconsensual blood tests altogether. 133 S. Ct. *at 1566, n.9 (state statutes catalogued). The necessary implication here is that some States, through the manifested will of their citizens, decided that *not even a warrant from a judge* could permit the nonconsensual drawing of blood in the drunk driving context. The privacy interest at stake here is exceedingly broad.

The Government's references to history and tradition more better support Plaintiffs' case than their own. *See Gray v. Romeo*, 697 F. Supp. 580, 584-85 (D.R.I. 1988) (asserting that the

right to make medical decisions affecting one's body is deeply rooted in the country's history and tradition, and pointing to precedent dating back to the nineteenth century).  *See also Duncan v. Scottsdale Med. Imaging, Ltd.*, 70 P.3d 435, 437 (Ariz. 2003) (en banc) (explaining that it is well established that a health care provider performing a medical procedure, such as an injection, without a patient's consent commits a common law battery, and further describing two theories of liability that courts recognize for unwanted medical treatment: a traditional intentional tort claim for battery and a negligence claim for lack of informed consent); *see also* 1 William Blackstone Commentaries *129, *134 (profering that a person's uninterrupted enjoyment of his life, body, and health is among the principal rights of all mankind, and includes the guarantee of preserving one's health from practices that may prejudice or annoy it).

In light of the subsequent development of courts dealing with the issue of physical invasiveness and the right to privacy arguments, and the clear division within the population of the United States on this issue, rational basis review is totally improper.  The Government must argue its case under strict scrutiny review; they may claim compelling interest (questionable though that is given the disparate approach by the States to their declared public health emergencies) but EO 14043 is certainly not the least restrictive means available.

## II    THE VACCINE MANDATE IS CERTAIN TO CAUSE IRREPARABLE HARM BY INFRINGING ON THE CONSTITUTIONAL RIGHTS OF PLAINTIFFS AND ALL SUCH SIMILARLY SITUATED FEDERAL EMPLOYEES.

The injury is most assuredly imminent.  A close review of Ex. B, attached to the Complaint, on page 9, shows what OPM's Task Force sets out to do "with consistency across government in enforcement":

> Employees covered by Executive Order 14043 who fail to comply with a requirement to be fully vaccinated or provide proof of vaccination and have neither received an exception

nor have an exception request under consideration, **are in violation of a lawful order**. Employees who violate lawful orders are subject to discipline, up to and including termination or removal. Consistent with the Administration's policy, agencies should initiate an enforcement process to work with employees to encourage their compliance. Accordingly, agencies should initiate the enforcement process with a brief period of education and counseling (5 days), including providing employees with information regarding the benefits of vaccination and ways to obtain the vaccine. If the employee does not demonstrate progress toward becoming fully vaccinated through completion of a required vaccination dose or provision of required documentation by the end of the counseling and education period, it should be followed by a short suspension (14 days or less). Continued noncompliance during the suspension can be followed by proposing removal.

Through a mere 600-word Executive Order, the Government has attempted to make this about conduct, i.e. violation of a lawful order, and then use that as the premise for termination when in fact this has nothing to do with conduct at all, but rather is an unlawful aggregation of authority that the President simply does not possess (*See Infra*, argument below on Separation of Powers Doctrine and nondelegation doctrine).

Plaintiffs are invoking their Ninth Amendment rights on behalf of themselves and others similarly situated, namely the Right to Privacy from a) unwanted physical intrusion and its coercion; and b) the collection of sensitive medical information as it pertains to the intrusion. Contrary to the Government's contention, whenever a constitutional right is concerned, irreparable harm is demonstrated forthwith. *See, e.g., Ne. Fla. Chap. Of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (constitutional injuries presumed to be irreparable harm). *See also* the recent Supreme Court finding in the eviction moratorium case of irreparable harm based on a property owner's historical right to exclude based in common law, tracing back even to English Common Law. *Alabama Assoc. of Realtors v. Dpt. Of Health and*

*Human Services*, 594 U.S. ___ (2021).    That case was *during* the declared public health emergency, which was offered as the Government's justification then as it is now.  As laid out above, Plaintiffs' right to be free of coercion of unwanted physical invasion has its roots in history.

As in *Alabama Assoc. of Realtors,* we too are dealing with an unlawful exertion of authority that affects a population en masse.  The Federal Government will find itself understaffed and faced with the prospect of rushing to make replacements.  Here is where the Government's argument, which normally applies in less-than-extraordinary situations, fails.  Without an emergency preliminary injunction to keep the status quo, it will not be feasible to do reinstatements if the President's order is eventually declared unconstitutional.  Even backpay would be impractical with this many employees, as that would mean the Government would be paying employees essentially twice (for those removed as well as the replacements) for a period of time.  All of this militates in favor of a preliminary injunction while the Executive Order is under review.  The Government has successfully worked through eighteen months of the pandemic with the aid of COVID-19 testing, social distancing, and the responsible use of personal protective equipment (PPE).  It does no harm to the Government to wait a little longer, especially given the massive objection raised by so many good people in the federal government who have served their country faithfully.

A    **THERE IS NO SCENARIO WHERE PLAINTIFFS WOULD END UP WITH A "MORE FAVORABLE RESULT"**

Plaintiffs, like the Government, are set in their positions.  They have made the choice about their own bodily integrity and they will abide by it.  For the Government to raise the prospects of religious or medical exemptions, that does not apply here.  The Government has access to Plaintiffs' supervisors and employee relations' offices to verify this fact.  In any case, those who do qualify are the exception, not the rule.  And this is a case not about employment actions but about constitutional civil rights.

The Government will have found Employee A and Employee B to be sterling employees. Employee A has sixteen years in working for the federal government.  He therefore has much to lose being so close to retirement.  His skills are also specialized.  The Government is wrong and entirely self-serving to downplay the prospect of the inability to even collect unemployment compensation, based on severance for disobeying a lawful order, particularly in an economy that continues to struggle with the pandemic.

III    **THE GOVERNMENT HAS NOT, AND CANNOT, CITE TO ANY LAW IN THE CIVIL SERVICE REFORM ACT THAT VESTS HIM WITH HEALTH REGULATORY AUTHORITY FOR THE CIVIL SERVICE.**

The Executive Order principally relies upon Title 5 of the United States Code, Sections 3301, 3302, and 7301.  Exhibit A, attached to the Complaint (Executive Order 14043), which state as follows:

> §3301      The President may-
> (1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service;
> (2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought; and
> (3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section.
>
>
> §3302      The President may prescribe rules governing the competitive service.  The rules shall provide for exceptions of positions of the competitive service.
>
> §7301      The president may prescribe regulations for the conduct of employees in the executive branch.

The Vaccine Mandate is not an evaluation of health status for a position; it is a preventative measure at its essence. The context here would be, for example, an application for a special agent position, where running and physical exertion may be involved, or upper body strength for the

movement of boxes.  If Congress delegated the authority to make such a drastic change to the conditions of employment as to require COVID-19 vaccination (without even the option of weekly testing as an alternative), it would have done so *explicitly*.  Rather, the courts that have dealt with the openendedness of the above language have found that Congress has done so intentionally, and have resorted to the longstanding traditions contained in the American employer-employee relationship for the intepretation.  On this point the Government loses.  They can show no clear basis historically for a president even attempting to impose such a requirement on the Civil Service, though the country has been around long enough to see other pandemics.

The key language touching on adverse actions for federal employees, "such cause as will promote the efficiency of the service," is to be construed in light of "longstanding principles of employer-employee relationships, like those developed in the private sector . . ."  *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974).

### A      CONGRESS BEARS THE RULEMAKING AUTHORITY OVER THE CIVIL SERVICE AND HAS NOT EXPLICITLY DELEGATED TO THE PRESIDENT THE AUTHORITY TO MAKE SUCH A SIGNIFICANT AND SUBSTANTIAL CHANGE TO THEIR CONDITIONS OF EMPLOYMENT.

Under ordinary circumstances, such as the case cited to by counsel for the Government by this Court, *Lim v. United States*, No. 10-cv-2574, at *6 (D.Md. July 5, 2011) (Chasanow, J.), the case would go to the Merit Systems Protection Board.  Indeed, it is the perfect example:  a doctor admitted into an FDA fellowship program who claims he witnessed safety concerns and fraudulent work, and suffered retaliation for taking a stand.  There are a number of merit systems principles that apply there, and would properly be adjudicated by the Merit Systems Protection Board.  *Fausto*, 484 U.S. 439 (1988) can similarly be adjudicated by the Board, in that it involves termination for misuse of a government vehicle.  These are case specific sets of facts.  Here, on the other hand, the set of facts are common to both Plaintiffs and *all* others similarly situated.  They

are being placed on the fast track to dismissal for no other reason than that they did not certify to their employers that they are fully vaccinated with a COVID-19 vaccine, which flagrantly violates their Right to Privacy.  There would be nothing to adjudicate as the inquiry would simply end on this point.

The proper forum is where it is now, in federal district court.  The corollary to this is that sensitive medical information is being collected en masse (an ongoing violation) as it relates to the unlawful Executive Order.     Unlike HIPAA, in which the business is required to obtain the patient's written consent prior to the sharing of any private medical information (and for each instance of such), the Privacy Act of 1974 would leave the door wide open: "it may be necessary to disclose this information externally, for example to disclose information to: [...] **contractors, grantees, or volunteers** as necessary to perform their duties for the Federal Government."  *See* Complt., Ex. D ¶3 (ECF 1).  Just two or three years ago, this would have been considered ridiculous to force people to give up this kind of information, which does indeed carry a stigma in today's society, and this will become more firmly cemented in the coming days.  It is for this reason that sixteen States have made laws against the use of COVID-19 passports.  *See* Plaintiff's Mem. in Supp. of Mot. at 6.  With such division in the country, this does suggest a reason why Congress did not vest the President with the authority he lacks in Executive Order 14043.

The Fourth Circuit, in *International Refugee Project v. Trump*, Chief Judge Gregory puts it well: "[t]he clear-statement rule guards against unnecessary erosion of separation of powers and political accountability **by insisting that the legislature directly confront the benefits and implications of these decisions** . . . [T]he President does not, within the confines of the Constitution, decide major questions that are within the legislative function." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 274 (4th Cir.), as amended (Feb. 28, 2018) (Gregory,

C.J., concurring).  For Congress to delegate the sweeping power Executive Order 14043 claims, it must do so clearly.  *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). *See also MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231 (1994); *Industrial Union Dpt., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 645-646 (1980) (plurality opinion).  It did not do so here.

**IV      DESPITE THE POLICY PREFERENCES OF THE PRESIDENT, HEALTH REGULATORY AUTHORITY IS SQUARELY IN THE PROVINCE OF THE STATES AND CONGRESS NEVER INTENDED TO CHANGE THIS.**

Particularly when the Federal Government is invading what is traditionally known as an area of state law, Congressional authorization must be clear.  "Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Alabama Assoc. of Realtors v. Department of Health and Human Services*, 594 U.S. ___ *at 6 (2021) (quoting *United States Forest Service v. Cowpasture River Preservation Assn.*, 590 U.S. ___ (2020) (slip op., at 15 – 16).    In *Alabama Assoc. of Realtors*, "the moratorium intrudes into an area that is the particular domain of state law: the landlord-tenant relationship." *Id*. at 6.  Likewise in the instant case, the Federal Civil Service is not localized to Washington DC but is rather spread throughout the States, as in the case of Employee B who lives in Idaho.  Idaho happens to be one of the States that has made the use of COVID-19 passports unlawful.  Yet, she is equally subject to the stringent requirements of the Executive Order.  *Cf. Alabama Assoc. of Realtors, supra*, *at 1 – 2 ("[i]t strains credulity to believe that this statute grants the (Center for Disease Control and Prevention) the sweeping authority that it asserts."  Put simply, Congress never made this clear to make way for the President to act the way he did here in Executive Order 14043.

In fact, Congressional intent in the area of health law can be found in the Health Insurance Portability and Accountability Act (HIPAA), passed by both Houses in 1996, is instructive.  So concerned was Congress in that protection of sensitive medical information by health care providers that any disclosures not expressly permitted or required by HIPAA needs the individual's *written* authorization to make the disclosure.   A fair inference can be made that a significant part of the purpose behind the long list of stringent procedural safeguards contained in HIPAA was to protect from an employer or potential employer getting hold of the information and using it to discriminate in hiring, promotion, etc.  Executive Order 14043 seeks to turn all that on its head with one fell swoop, and a mere 600 words, acting unilaterally as the Office of the President without any express delegated authority or legislative lawmaking on such an important subject.

The Privacy Act of 1974, 5 U.S.C. §552a, Pub. L. No. 93-579 is a United States federal law that establishes a Code of Information Practice that governs the collection, maintenance, use, and dissemination of personally identifiable information (PII) about individuals that is maintained in systems of records by federal agencies.  Pursuant to 5 U.S.C. §552(e), agencies must state the authority – in this case the Executive Order – which authorizes the solicitation and whether the disclosure is mandatory or voluntary.  As discussed above, the ongoing collection of sensitive medical information on vaccination status to which Plaintiffs object, and ask this Court to stop, is now potentially in the hands of "volunteers," "grantees," and "contractors."  *See* Exhibit D, attached to the Complaint ¶3.  All of this sensitive information is being collected and stored by nothing short of government coercion.

**A      THE SUPREMACY CLAUSE ARGUMENT FAILS BECAUSE THE GOVERNMENT CAN CITE TO NO ENUMERATED POWER THAT WOULD PROVIDE IT CONCURRENT AUTHORITY IN THE AREA TRADITIONALLY RESERVED TO THE STATES.**

11

The Government relies on the very limited progeny of *Jacobson*, to cite two cases involving religious freedom and *state* child vaccines requirements for school. *Prince v. Massachusetts*, 321 U.S. 158, 166-67. But the Government overlooks the fact that "the state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities **and on matters of employment**." *Id*. at 168. The Government makes passing reference to the Interstate Commerce Clause but surely (and hopefully) the Government is not attempting to make that contention.

**V       THIS COURT MAY LOOK TO *GRISWOLD V STATE OF CONNECTICUT* FOR THE NINTH AMENDMENT RIGHT OF PRIVACY CLAIMS.**

The Ninth Amendment, according to Justice Goldberg's concurrence in *Griswold v. State of Connecticut*, 381 U.S. 479 (1965) was "proferred to quiet expressed fears that a bill of specifically enumerated rights could not be sufficiently broad to cover all essential rights and that the specific mention of certain rights would be interpreted as a denial that others were protected." *Id*. at 488-9. According to Justice Goldberg, James Madison, Father of our Constitution, successfully was able to pass it in original form without dispute. In the opinion, it states, "the specific guarantees of the Bill of Rights have **penumbras**, formed by emanations from those guarantees that help give them life and substance." *Id*. at 484.

Bodily integrity, though not explicitly written into the Constitution, traces back to the beginnings of western civilization in the form of criminal and tort laws. The personal choice that Plaintiffs and the federal employees are now being forced to make in reference to COVID-19 vaccines is undoubtedly one of the highest order, not to be compared with previous executive orders cited to by the Government in the area of smoking and drugs in the workplace. Those kinds of orders warrant rational basis review. This is quite different. One need look no further than see just how many are staking their livelihoods on this decision that is thrust upon them.

Justice Goldberg's concurrence goes on to say, "In sum, the 9th Amendment simply lends strong support to the view that the 'liberty' protected by the 5th and 14th Amendments from infringement by the Federal Government or the States is not restricted to rights specifically mentioned in the first eight amendments. *Cf. United Public Workers v. Mitchell*, 330 U.S. 75, 94-95 (1947)." *Id.* at 493.

## VI      ABSENT A PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO, NOT ONLY WILL HARM COME TO PLAINTIFFS AND OTHERS SIMILARLY SITUATED, BUT HARM WILL CERTAINLY COME TO THE UNITED STATES GOVERNMENT.

The equities and the public interest weigh heavily in favor of a preliminary nationwide injunction.  Plaintiffs are two of many who have already made their decision.  The November 8th deadline has passed for the submittal of proof of fully vaccinated status.  The Government has admitted over telephone conference that the Government is in keeping (plus or minus a week) with its stated goal of consistency across agencies by implementing enforcement according to the November 8th and November 22nd deadlines.  It is beyond question that the harm is abundantly clear and imminent.[1]

The Parties have devoted much discussion to the Executive and Legislative branches of Government; now it is time for the Judiciary to act.  Absent a preliminary nationwide injunction, mass layoffs will ensue for an Executive Order with flimsy reliance on Title 5 Code Sections 3301, 3302, and 7301.  The Government is expected to become short staffed, with numerous valid claims brought against it.  Replacements will have to be hired en masse.  Meanwhile, all of these good people who are let go will be facing an extremely uphill battle for no other reason than a choice they made about their own bodily integrity and efforts to protect against the collection and storage of sensitive medical information.

---

[1]  The Government also admits, on p. 22 of the Opposition Brief, the end result is certain.

In all this, the Government has unclean hands as well for the simple reason that there is not even a scintilla of evidence that an investigation was even attempted at exploring alternatives, such as COVID-19 testing or temperature checks, that would respect the rights of Plaintiffs and these many federal employees.  A significant number of the States have done just that, which strongly suggests this is a policy preference on the part of the President.  The significant rights asserted by Plaintiffs and those like them are in much greater need of protection at this critical juncture.

## CONCLUSION

Relief should not be narrowly tailored.  It should come in the form of an immediate nationwide injunction while the constitutionality is determined.


November 16, 2021                                    Respectfully submitted,

                                                     /s/ Jonathan B. Bolls
                                                     P.O. Box 10076
                                                     5221 Franconia Road
                                                     Alexandria, VA  22310
                                                     [T](703) 593-2354
                                                     jonathanbolls@hotmail.com

                                                     *Attorney for Plaintiffs*